MICHAEL DRENA,
       Plaintiff,

v.

BANK OF AMERICA, N.A.
       Defendant.

No. 3:15-cv-176 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Michael Drena ("Plaintiff" or "Mr. Drena"), acting *pro se*, filed a seven-count Complaint against his mortgagee, Bank of America, N.A. ("Defendant" or "Bank of America") for allegedly improperly (i) increasing his mortgage payments and (ii) delaying review of his applications for modification of his home mortgage. Compl., ECF No. 1. The Court dismissed two of his claims—a breach of the covenant of good faith and fair dealing claim and a claim under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b). ECF No. 30.

Bank of America has moved for summary judgment on Mr. Drena's remaining claims: violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.* (count one); the Connecticut Creditor's Collection Practices Act ("CCPA"), Conn. Gen. Stat. § 36a-645 *et seq.* (count two); innocent misrepresentation (count three); negligent misrepresentation (count four); and negligent infliction of emotional distress (count six). Mot. Summ. J., ECF No. 39.

For the following reasons, Bank of America's motion for summary judgment is **GRANTED** in part and **DENIED** in part. The motion is granted as to the CCPA claim (count two), the innocent misrepresentation claim (count three), the negligent misrepresentation claim

(count four), and the negligent infliction of emotional distress claim (count six), and denied as to

the CUTPA claim (count one).

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Mortgage

On February 6, 2008, Mr. Drena and his wife, Mrs. Janine Drena (the "Drenas"),

obtained a $260,000 home mortgage loan from Bank of America in exchange for a promissory

note in favor of Bank of America. Def.'s L.R. 56(a)(1) Stmt. ("SMF") ¶ 1, ECF No. 39-35.[1] To

secure the obligations under the promissory note, the Drenas executed a loan on the property at

84 Duncaster Road, in Bloomfield, Connecticut, in favor of Bank of America. *Id.* ¶ 2. The

monthly installments due on the loan were $1,476.26. *Id.* ¶ 5. Because Bank of America had

waived payments for an escrow account,[2] the monthly installments did not include property

taxes, assessments, and insurance premiums.[3] *Id.* ¶ 6. On February 29, 2008, the Drenas provided

---

[1] On December 19, 2016, Bank of America served Mr. Drena with a Local Rule 56(b) Notice to Self-Represented Litigants Regarding Summary Judgment. ECF No. 39-36. Bank of America represents that on January 9, 2017, Mr. Drena informally sought an extension from Bank of America to file his opposition papers until January 20, 2017. Without seeking a further enlargement of time to respond, Mr. Drena did not file his opposition papers until March 7, 2017. Bank of America argues that because Mr. Drena's opposition was filed late by approximately 46 days, it should be stricken in its entirety. Def.'s Reply Br. at 2 (citing D. Conn. L. R. 55(b)). The Court agrees.

Local Rule 56(b) provides that the party opposing summary judgment must file opposition papers within 21 days of the date of the motion and allows for three additional days under certain conditions. D. Conn. L. R. 55(b). The Rule further provides that, if the litigant does not file papers consistent with the Federal and Local Rules of Civil Procedure 56, "THE MOTION MAY BE GRANTED . . . IF THE MOTION SHOWS THAT THE MOVANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW." D. Conn. L. R. 56(b). Here, Mr. Drena was notified of the consequences of failing to respond to the motion for summary judgment, and presumably with this knowledge, sought an informal extension of time to file from Bank of America. The Court therefore decides this motion without consideration of Mr. Drena's untimely opposition. *See* D. Conn. L. R. 55(b); *see also Watson v. Geithner*, 355 F. App'x 482, 483 (2d Cir. 2009) (finding no abuse of discretion in trial court's decision to decline to consider a *pro se* plaintiff's untimely response to summary judgment).

[2] The home mortgage contained a waiver of escrow provision. Under that provision, Bank of America could waive and did waive the Drenas' obligation to pay into an escrow account certain amounts for payments enumerated in the home mortgage. Def.'s Br., Ex. B at 5–6, ECF No. 39-31. Bank of America had the right to revoke the waiver of escrow at any time by providing the Drenas written notice. *Id.* at 6, 12.

[3] The escrow items were "amounts due for: (a) taxes and assessments . . . (b) leasehold payments or ground rents . . . (c) premiums for any and all insurance . . . and (d) Mortgage Insurance premiums." *Id.* at 5.

Bank of America permission to automatically debit their checking account, beginning with the installment due on April 1, 2008. *Id.* ¶ 9. Consistent with the Drenas' instruction, Bank of America began debiting the monthly installment due on April 1, 2008, and all monthly installments thereafter, until October 2010. *Id.* ¶ 10. Bank of America has serviced the mortgage loan since origination and continues to do so. *Id.* ¶ 4.

In 2009, Mr. Drena "suffered a substantial loss of income." Def.'s Br., Ex. C at 3, ECF No. 39-32. His business was reeling from an economic recession that contracted the business by twenty percent. *Id.* His income was further limited by prospective alimony payments as a result of his impending divorce from his wife. *Id.* at 3–4.

### B.    Discussions Around Mortgage Modification

In November 2009, in light of his economic difficulties, Mr. Drena contacted Bank of America to inquire about options to modify his home mortgage loan. Def.'s SMF at ¶ 14; *see also* Def.'s Br., Ex. C at 5. In December 2009, Bank of America sent Mr. Drena a loan modification application. Def.'s Br., Ex. C at 6. Upon receiving the application, Mr. Drena reviewed it but "decided not to participate due to the fact that a[n] escrow account was being added in." *Id.* With declining business opportunities, newly imposed alimony payments, and the seasonal nature of his work, Mr. Drena thought he could not support the additional payments that an escrow would require. *Id.* He "did not sign any documents or send in any application." *Id.*

After its December 2009 offer, Bank of America extended another opportunity to the Drenas to modify their loan. In a letter dated January 14, 2010, Bank of America informed the Drenas that their home mortgage loan potentially qualified for a four-month trial period plan under the Home Affordable Modification Program ("HAMP").[4] Def.'s Br., Ex. A-3 at 2, ECF

---

[4] The Home Affordable Modification Program ("HAMP") was a part of the Making Home Affordable Program ("MHAP"), a federal government initiative. HAMP was "designed to help home owners who [were] having

No. 39-5. Under HAMP, instead of making their existing mortgage payment, the Drenas would pay a trial period mortgage payment of $1,859.99. *Id.* at 2. The trial period payment included payments for escrow items, "including real estate taxes, insurances premiums, and other fees." *Id.* at 8. To confirm their eligibility for HAMP, Bank of America attached to its letter documents for the Drenas to complete and return to Bank of America.[5] The Drenas did not accept the offer. Def.'s SMF ¶ 17.

On January 22, 2010, Bank of America claims to have completed an "escrow analysis" on the Drenas' loan and provided the results to the Drenas along with the monthly statement for the February 2010 monthly instalment. *Id.* ¶ 18. Bank of America claims that the statement and analysis put the Drenas on notice that, beginning with the March 10, 2010, installment, the monthly amount due would increase to $2,332.21, $855.95 of which was for escrow payments. *Id.*

Later that month, on January 29, 2010, Mr. Drena and Mrs. Drena divorced, and Mrs. Drena subsequently transferred her interest in the home to Mr. Drena by quit claim deed on March 15, 2010. Def.'s Br. Ex. D at 2–3, ECF No. 39-33; Def.'s Br. Ex. E at 2–3, ECF No. 39-34.

On March 5, 2010, Mr. Drena called Bank of America after noticing overdraft charges on his checking account. Def.'s Br. Ex. C at 7. Bank of America had charged his account for $830. *Id.* Bank of America informed Mr. Drena that the MHAP required an $830 escrow fee. *Id.*; *see*

---

difficulty making their payments by modifying loans to a level that [were] affordable for borrowers." Def.'s Br., Ex. A-9 at 3, ECF No. 39-11. An eligible participant could enter into a three month trial period plan, and if the participant successfully completed the trial, then the participant's home mortgage loan would be permanently modified. *Id.*

[5] Bank of America requested: (i) "Signed Mortgage Servicer copies of the Home Affordable Modification Trial Plan"; (ii) a "Hardship Affidavit completed and signed by" the Drenas; (iii) a "completed, signed and dated copy of the most recent tax return for" the Drenas; (iv) the "Freddie Mac Form 1126" and (v) "[d]ocumentation to verify all of the income of [the Drenas]." ECF No. 39-5 at 2.

*also* Def.'s SMF ¶ 24. But, according to Mr. Drena, he had never signed up to participate in the MHAP. Def.'s Br. Ex. C at 7.

Around the same time, Mr. Drena went to the Bank of America branch in Bloomfield, Connecticut, and spoke with the branch's Vice President, Ms. Vera Lembrecht, concerning his situation. *Id.* at 7–8. Ms. Lembrecht called Bank of America's modification department, and the modification team member explained that Mr. had been placed in HAMP upon his verbal authorization. *Id.* at 8. Further, according to Mr. Drena, the Bank of America modification team member explained that, if Mr. Drena failed to apply for the program, he could not reapply. *Id.* Therefore, according to Mr. Drena, he executed the application and submitted the required information to be considered for the program. *Id.*

About two weeks later, on March 20, 2010, Bank of America sent the Drenas a letter informing them that Bank of America required additional information to verify whether they could participate in HAMP. Def.'s Br. Ex. A-5 at 2, ECF No. 39-7. The letter instructed the Drenas to send the requested information by March 30, 2010. *Id.*

The Drenas' loan history statement includes transaction details on the Drenas' mortgage, beginning in February 2008 and ending in November 2016. Def.'s Br. Ex. A-2, ECF No. 39-4. From April 1, 2008, through and including February 1, 2010, the report shows that the Drenas made monthly payments of $1,476.27. *Id.* at 3–4. The report also shows a $.00 escrow balance and $.00 in late charges and the unapplied total.[6] *Id.* For the March 1, 2010, payment, the report showed a monthly payment of $2,332.21, and an escrow balance of $855.96. *Id.* at 4. Beginning in April 2010, the escrow balance fluctuated, going as high as $22,888.26 in March 2014. *Id.* at

---

[6] The Court notes that the February 2, 2010, entry shows an escrow balance of $.01. Def.'s Br. Ex. A-2 at 4.

4–7. Similarly, beginning in April 2010, unapplied totals fluctuated, reaching $7,270.25 in March 2014, and late fees assessed against the account begin to accrue. *Id.* at 4–8.

In a letter dated November 16, 2010, Bank of America sent the Drenas a notice of intent to accelerate the mortgage. Def.'s Br. Ex. A-7 at 3–8, ECF No. 39-9. The notice provided that the home mortgage loan was "in serious default because the required payments have not been made." *Id.* at 3. The letter explained that "[i]f the default is not cured on or before December 16, 2010, the mortgage payments **will be accelerated** with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceeding will be initiated at that time." *Id.* The letter further stated that, if the Drenas were unable to cure the default, Bank of America "want[ed] [them] to be aware of various options that may be available . . . to prevent foreclosure sale of the property." *Id.* Those options included:

> Repayment Plan: It is possible that you may be eligible for some form of payment assistance through [Bank of America]. [Bank of America's] basic plan requires that [Bank of America] receive, up front, at least ½ of the amount necessary to bring the account current, and that the balance of the overdue amount be paid, along with the regular monthly payment, over a defined period of time. Other repayment plans also are available.
>
> Loan Modification: Or, it is possible that the regular monthly payments can be lowered through a modification of the loan by reducing the interest rate and then adding the delinquent payments to the current loan balance. This foreclosure alternative, however, is limited to certain loan types.
>
> Sale of Your Property: Or, if you are willing to sell your home in order to avoid foreclosure, it is possible that the sale of your home can be approved through [Bank of America] even if your home is worth less than what is owed on it.
>
> Deed-In Lieu: Or, if your property is free from other liens or encumbrances, and if the default is due to a serious financial hardship which is beyond your control, you may be eligible to deed your property directly to [Bank of America] and avoid the foreclosure sale.

*Id.* at 4.

Less than one month after sending its notice of intent to accelerate, on December 10, 2010, Bank of America denied Mr. Drena's request for a HAMP modification. Def.'s Br. Ex. A-8 at 2, ECF No. 39-10. In that letter, Bank of America explained to the Drenas that it had "reviewed [their] financial information to identify any additional modification options and unfortunately, [the Drenas'] loan [was] not eligible for a modification." *Id.* Bank of America stated it "[knew] it was a difficult time for [the Drenas] and [it] want[ed] to help [them] avoid the negative consequences of a foreclosure." *Id.* To that end, Bank of America explained the "next step to help [them] avoid foreclosure is a short sale or a deed in lieu of foreclosure." *Id.* The letter explained those options:

> Short Sale: With this program, you agree to sell your home and the proceeds of the sale are used to pay your mortgage debt, even if the proceeds are less than the outstanding balance on you mortgage;
>
> Deed in lieu of foreclosure: With this program, you transfer the title of your home to [Bank of America] instead of paying your mortgage debt, even if the value of the property is less than the outstanding balance on your mortgage;
>
> The Fannie Mae Deed-for-Lease program: With this program, you agree to a deed in lieu of foreclosure and transfer the title of your property to Fannie Mae instead of paying your mortgage debt, even if the value of the property is less than the outstanding balance on your mortgage. You then lease the property back from Fannie Mae at a current rental rate.

*Id.*

The Drenas appealed the December 2010 decision. Def.'s Br., Ex. A ¶ 28, ECF No. 39-2. On February 10, 2011, Bank of America informed the Drenas of its decision concerning their appeal. Def's Br., Ex. A-9 at 2, ECF No. 39-11. Bank of America explained that, based on the HAMP guidelines, the Drenas were "not eligible for a loan modification based on the

information in [their] original application; therefore, [their] original application [had] been closed." *Id.* at 2. Bank of America advised the Drenas that because they indicated that their financial information had changed, Bank of America invited them to reapply for the program by sending a new application with the supporting documents by March 12, 2011. *Id.* Bank of America sent another letter to the Drenas on February 28, 2011, explaining that they were not eligible for the HAMP modification based on the information they had submitted but invited them to reapply. *Id.* at 12.

On March 2, 2011, Mr. Drena submitted another HAMP modification request to Bank of America. Def.'s Br., Ex. A-10, ECF No. 39-12. Bank of America responded on April 2, 2011, indicating that Mr. Drena's application was deficient because it did not contain all the required information and therefore, it could not complete its eligibility review. Def.'s Br., Ex. A-11 at 2, ECF No. 39-13. Bank of America requested the Drenas send the missing documents by May 2, 2011. *Id.* On May 4, 2011, Bank of America sent another letter to the Drenas stating that it was still missing information from them necessary to conduct its review. Def.'s Br., Ex. A-12 at 2, ECF No. 39-14. Bank of America gave the Drenas until May 19, 2011, to submit the missing information. *Id.*

On June 4, 2011, Bank of America informed the Drenas that they were not eligible for a HAMP modification because they had failed to provide it the requisite information. Def.'s Br., Ex. A-13 at 2–3, ECF No. 39-15. The letter also stated that Bank of America was reviewing the Drenas' financial information to determine whether they qualified for other options including (i) "[a] different modification program;" (ii) "a forbearance program" that would allow them to "receive lower payments or no payments for a limited number of months to either give [them] time to resolve [their] financial difficulties or give [Bank of America] time to work together with

[him] on a more permanent solution;" (iii) "a short sale;" (iv) "[a] deed in lieu of foreclosure;" (v) "[t]he Fannie Mae Deed-for-Lease program." *Id.*

After the June 4 denial, and after Mr. Drena had submitted an additional HAMP modification request, Def.'s Br., Ex. A-14, ECF No. 39-16, Bank of America informed the Drenas that they had been approved for a trial period plan under the Fannie Mae Modification program, Def.'s Br., A-15 at 2–3, ECF No. 39-17. The Drenas declined to participate in the program but did submit an application for an additional HAMP modification. Def.'s Br., Ex. A ¶ 36.

On April 6, 2012, Bank of America offered the Drenas a permanent loan modification. Def.'s Br., A-17, ECF No. 39-19. The proposed modification reduced the Drenas' home mortgage loan's interest, monthly installments, and capitalized delinquent interest and delinquent escrow. *Id.* at 2–5. As with Bank of America's other offers, the Drenas rejected the offer. Def.'s Br., Ex. A ¶ 38. Instead, the Drenas submitted another HAMP modification request on May 15, 2012. Def.'s Br., Ex. A-18. Less than a month later, on June 13, 2012, Bank of America informed the Drenas that their "mortgage [was] seriously delinquent." Def.'s Br., Ex. A-19 at 2, ECF No. 39-21. The letter stated that Bank of America "tried to contact [the Drenas] to discuss foreclosure prevention options that [were] available, but time [was] running out." *Id.* The letter further provided that the Drenas had been approved to participate in a trial period plan to assist the Drenas in making "affordable and sustainable mortgage payments." *Id.* The Drenas declined to participate in this program. Def.'s SMF ¶ 46.

Following a national settlement between Bank of America and U.S. Department of Justice ("DOJ"), on March 22, 2013, Bank of America invited the Drenas to apply for another modification program—the DOJ Modification Program. Def.'s Br., Ex. A-20 at 2, ECF No. 39-

22. The DOJ Modification program "included a principal forgiveness component in addition to modified loan terms." Def.'s L.R. SMF ¶ 50. Bank of America contacted the Drenas through their attorney about the program multiple times in June 2013. Def.'s Br., Ex. A-22 at 2, 11, 20, 29, 38, ECF No. 39-24. Following those invitations, Mr. Drena submitted two additional HAMP modification requests. Def.'s Br., Ex. A-21, ECF No. 39-23; Def.'s Br., Ex. A-27, ECF No. 39-25. Bank of America then sent the Drenas two additional invitations to apply to the DOJ Modification program. Def.'s Br., Ex. A-24 at 2–4, ECF No. 39-26; *id.* 5–6.

## C.  MODIFICATION OF THE LOAN

In its September 30, 2013, letter, Bank of America "informed the [Drenas] that [their home mortgage] loan qualified for a three month trial period plan under the DOJ Modification Program with trial payments in the amount of $1,725.46 due by November 1, 2013, December 1, 2013, and January 1, 2014, and an estimated $66,070.63 in principal to be permanently forgiven." Def.'s SMF ¶ 54. The Drenas opted to participate in the trial period plan and timely submitted three trial payments. *Id.* ¶ 55.

Following their successful completion of the trial period, on January 8, 2014, Bank of America informed the Drenas that the home mortgage loan was eligible for permanent modification under the DOJ modification program. *Id.* ¶ 56. Under this modification, $65,425.39 of the principal would be forgiven and the home mortgage loan would be reduced. *Id.* The Drenas accepted the permanent modification offer and entered into a loan modification agreement with Bank of America on January 21, 2014. *Id.* ¶ 57. Under that agreement the "interest rate on the [home mortgage loan] was reduced to a fixed rate of 2% for years 1–5, 3% for year 6, 4% for year 7, and 4.5% for years 8–25, and $65,425.39 in outstanding principal was forgiven." *Id.* ¶ 58. On December 6, 2014, Bank of America informed the Drenas that, under the

DOJ Modification program, the home mortgage loan qualified for an additional principal reduction of $9,079.91. *Id.* ¶ 59.

## II.     STANDARD OF REVIEW

Courts must grant summary judgment if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record." *See* Fed. R. Civ. P. 56(c)(1)(A)–(B); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). A dispute regarding a fact is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and material if the substantive law governing the case identifies those facts as material. *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)); *see also Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing a summary judgment motion, the Court must resolve all ambiguities and draw all inferences from the record as a whole in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) ("To survive summary judgment, the nonmovant must merely show that 'reasonable minds could differ as to the import of the evidence in the record.'") (citation omitted).

Finally, *pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III. DISCUSSION

### A. CONNECTICTUT UNFAIR TRADE PRACTICES ACT (Count One)

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The statute "provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice." *Id.* § 42-110g.

"A violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Daddona v. Liberty Mobile Home Sales, Inc.*, 550 A.2d 1061, 1066–67. (Conn. 1988); *see also Ulbrich v. Groth*, 78 A.3d 76, 100 (Conn. 2013) (quoting *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 994 A.2d 153, 173 (Conn. 2010) (stating that a CUTPA claim may be based on either an "actual deceptive practice" or an unfair practice—that is, a "practice amounting to a violation of public policy")); *Wilkins v. Yale University*, 2011 WL 1087144, *4 (Conn. Super. Ct. 2011) ("A subset of unfair practices, recognized by our Supreme Court, is deceptive practices."). Because CUTPA is a "remedial" statutory scheme, *see* Conn. Gen. Stat. § 42-110b(d), it "must be liberally construed in favor of those whom the legislature intended to benefit." *Eder Bros. v. Wine Merchants of Connecticut, Inc.*, 880 A.2d 138, 149 (Conn. 2005) (citing *Fink v. Golenbock*, 680 A.2d 1243, 1260 (Conn. 1996)).

A CUTPA claim requires the plaintiff show that "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) [he] has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 947 A.2d 320, 329 (Conn. 2008) (internal quotation marks and citations omitted).

Bank of America challenges whether Mr. Drena has submitted evidence to raise a genuine issue of material fact as to whether its conduct was unfair under CUTPA. Specifically, Bank of America contends that Mr. Drena's two theories—(i) that it impermissibly added an escrow payment to his home mortgage loan and (ii) that it was dilatory in reviewing his home mortgage loan for modification—purporting to show Bank of America engaged in an unfair practice are unsupported by the record. Def.'s Br. at 4–7.

### 1.    Unfair or Deceptive Practice

To determine whether conduct is unfair or deceptive, Connecticut courts apply the "cigarette rule." *Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 589 (Conn. 2008). That rule asks:

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Id.* "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent, it meets all three." *Id.* The issue of whether a business practice is unfair generally

presents "a question of fact." *DeMotses v. Leonard Schwartz Nissan, Inc.*, 578 A.2d 144, 146 (Conn. App. Ct. 1990).

Bank of America argues that Mr. Drena has failed to submit evidence to raise a genuine issue of material fact as to whether it, under the terms of the mortgage agreement, impermissibly revoked its waiver of escrow such that it would rise to the level of an unfair practice under CUTPA. Although "a CUTPA claim cannot be based on only a breach of contract" absent "aggravating circumstances," *Henderson v. Wells Fargo Bank, N.A.*, No. 3:13-cv-378 (JBA), 2017 WL 731780, at *7 (D. Conn. Feb. 21, 2017) (internal quotation marks omitted) (citing *Canaan Apothecary, LLC v. Salisbury Pharmacy Grp., LLC*, No. 3:12-cv-1571 (VLB), 2014 WL 788944, at *8 (D. Conn. Feb. 25, 2014)), Bank of American mischaracterizes Mr. Drena's CUTPA claim.

At oral argument, Mr. Drena stated that he does not quarrel with Bank of America's right to revoke a waiver of escrow under the terms of the mortgage agreement. Instead, he argues that Bank of America engaged in an unfair practice when, after inquiring in November 2009 about loan modification options available to him, Mr. Drena specifically "decided not to participate due to the fact that a[n] escrow account was being added in," "did not sign any documents or send in any application," and therefore did not submit himself for consideration for a loan modification, Bank of America nonetheless revoked its waiver as a condition of him applying.[7]

---

[7] Bank of America seems to suggest that Mr. Drena, having testified in reference to his March 5, 2010, conversation with a Bank of America representative: "I figured I'm already two months into a trial period, I might as well sign up," Def.'s Br., Ex. C at 22, that Mr. Drena has conceded that he had given authorization for Bank of America to consider his loan for loss mitigation. *See* Def.'s SMF ¶ 14 ("On December 10, 2009, Plaintiff contacted [Bank of America] to discuss his financial hardship and loss mitigation option, gave his verbal authorization to review the Loan for a modification, and was told a loan modification application would be sent to him." (citing Def.'s Br., Ex. C at 22)). Construing inferences in Mr. Drena's favor, as the party opposing summary judgment, Mr. Drena did nothing more than recognize that, against his wishes and without notice, the escrow waiver had already been revoked, so he may as well go forward with the loan modification application, which required that escrow payment be factored into his monthly payment—payments he was already making.

Def.'s Br., Ex. C at 6. Then, when Mr. Drena spoke with Bank of America about the unauthorized charge, Bank of America informed him that if he did not apply for the program, he could not re-apply at a later date. Def.'s Br. Ex. C at 8. And only then did Mr. Drena execute the application and submitted the required information to be considered for the program. *Id.*

At his deposition, Mr. Drena testified that it was only after reviewing his bank statement, noticing a charge of $830, and contacting Bank of America on March 5, 2010, that he learned Bank of America had charged his bank account for an escrow payment. Def.'s Br., Ex. C at 7. Mr. Drena also testified that at no time before the call with Bank of America on March 5, 2010, did Bank of America notify him that it had revoked the waiver of escrow consistent with the terms of the home mortgage or enrolled him in HAMP, which required escrow. Def.'s Br., Ex. C at 12.

According to Mr. Drena, although he had "never signed anything" and "never sent in any documents" to participate in a Bank of America loan modification program, Bank of America had enrolled him in HAMP. *Id.* at 7. Mr. Drena further testified that he had rejected two earlier offers (in December 2009 and January 2010) by Bank of America to modify his home mortgage loan conditioned on the addition of escrow payments. *Id.* at 6; Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 16-17. Indeed, Mr. Drena testified that he had expressly declined one of the offers "due to the fact that a[n] escrow account [would be] added." Def.'s Br., Ex. C at 6.

As a result, a reasonable juror could conclude that Bank of America engaged in an unfair practice by unilaterally enrolling Mr. Drena—who had no notice, either as required under the mortgage or otherwise, that Bank of America had revoked the waiver of escrow; had provided no authorization or application to Bank of America before March 5, 2010; and had rejected two other Bank of America loan modification offers that required escrow—in HAMP, debiting his

account for escrow payments, and then inducing him to agree to the terms of HAMP by informing him that unless he submitted an application for enrollment, he could not reapply.[8]

Bank of America's arguments to the contrary only confirm that there is a genuine issue of material fact to be tried regarding Mr. Drena's CUTPA claim. Bank of America argues it provided written notice of the escrow payment to Mr. Drena and his wife, Def.'s Br. at 5, in the form of a January 2010 escrow analysis on the mortgage showing that the Drenas' monthly installments would cumulatively increase to $2,332.21 in March 2010, which included an escrow portion of $855.95. Def.'s SMF ¶ 21. Bank of America, however, has not provided evidence of this analysis or evidence that the Drenas authorized participation in the program, other than the affidavit of its employee, Lorena P. Diaz.

At oral argument, counsel for Bank of America conceded that no document confirming the bank's analysis or the authorization by the Drenas existed and that Ms. Diaz could not confirm either the existence of the analysis or the Drenas' authorization. In fact, Bank of America admittedly cannot produce any communications with the Drenas before 2011. *See* Diaz Aff. ¶ 5, Def.'s Br., Ex. A, ECF No. 39-2 ("[C]opies of monthly statements and escrow analyses mailed to [the Drenas] prior to November 2011 are not available because correspondence sent by [Bank of America] to its customers was not archived prior to November 1, 2011"). Mr. Drena, however, testified that he did not authorize his participation in the program. Def.'s Br., Ex. C, 39-32 at 6–7, 12. Because he has disputed his authorization to participate in the program, a genuine issue of material fact exists as to whether he was properly enrolled in the program, one to be decided by a jury.

---

[8] As Mr. Drena has raised a genuine issue of fact concerning whether Bank of America engaged in an unfair practice by making unauthorized and unilateral debits from his account, the Court need not consider his second alternate theory that Bank of America engaged in unfair conduct by failing to promptly modify his loan.

Second, Bank of America contends that, even after his March 5, 2010, call and after deducting payments from his account for the escrow, Mr. Drena did not instruct Bank of America to stop the automatic debiting of the increased escrow amounts. Def.'s Br. at 5. Because Mr. Drena's only viable CUTPA claim rests on Bank of America's enrolling him in a program without proper authorization, any legal argument premised on Mr. Drena's failure to end his participation in a program—and one he alleges that he did not sign up for—is beside the point. In other words, that argument may affect Mr. Drena's alleged damages, but it would not undermine his claim for liability under CUTPA.

### 2. **Ascertainable Loss**

There also is sufficient evidence in the record to allow a reasonable juror to find that the alleged unfair practice was a substantial factor in the injury Mr. Drena alleges. "[T]o be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an 'ascertainable loss' due to a CUTPA violation." *Collins v. Anthem Health Plans, Inc.*, 880 A.2d 106, 120 (Conn. 2005) (quoting *Larobina v. Home Depot, USA, Inc.*, 821 A.2d 283, 288 (Conn. App. Ct. 2003). "For purposes of CUTPA, '[a]n ascertainable loss is a deprivation, detriment, [or] injury that is capable of being discovered, observed or established.'" *Larobina*, 821 A.2d at 288 (quoting *Serv. Rd. Corp. v. Quinn*, 698 A.2d 258, 262 (Conn. 1997)). "[T]he words 'any ascertainable loss' [however] . . . do not require a plaintiff to prove a specific amount of actual *damages* in order to make out a prima facie case." *Id.* at 288 (quoting *Johnson Elec. Co. v. Salce Contracting Assocs., Inc.*, 805 A.2d 735, 743 (Conn. App. Ct. 2002).

When a plaintiff, such as here, seeks money damages,

> the language 'as a result of' in § 42–110g(a) requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff. . . . [P]roximate cause is [a]n actual cause that is a substantial factor in the resulting harm. . . . The question to be asked in ascertaining

> whether proximate cause exists is whether the harm which occurred
> was of the same general nature as the foreseeable risk created by the
> defendant's act.

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 947 A.2d 320, 330 (Conn. 2008) (quotation

marks omitted) (quoting *Abrahams v. Young & Rubicam, Inc.*, 692 A.2d 709, 712 (Conn. 1997)).

"Generally, under Connecticut law, causation is a question reserved for the trier of fact, unless 'a

fair and reasonable person could reach only one conclusion' that there was no causation."

*Langan v. Johnson & Johnson Consumer Companies, Inc.*, No. 3:13-CV-1470 (JAM), 2017 WL

985640, at *9 (D. Conn. Mar. 13, 2017) (citing *Abrahams v. Young & Rubicam, Inc.*, 692 A.2d

709, 712 (Conn. 1997)).

There is evidence in the record to suggest that Mr. Drena's alleged injury is "capable of

being discovered, observed or established." *Larobina*, 821 A.2d at 288. The Drenas' loan history

statement shows that the Drenas made monthly payments toward their mortgage in the amount of

$1,476.27, without an escrow balance or late charges from April 1, 2008, through February 1,

2010. Def.'s Br. Ex. A-2 at 3–4, ECF No. 39-4. Beginning on March 1, 2010, around the same

time when Mr. Drena contacted Bank of America to inquire about the charges on his account, the

statement shows a monthly payment of $2,332.21, and an escrow balance of $855.96. *Id.* at 4.

Thereafter, late fees begin to accrue against the account and the escrow balance and unapplied

totals fluctuated from month to month. *Id.* at 4–8.

The increased charges create a genuine issue of material fact as to whether Mr. Drena

suffered an ascertainable loss. *Cf. Quinn*, 698 A.2d at 263–64 (recognizing that the "trier of fact

may draw reasonable and logical inferences from the facts proven," and thus it was reasonable to

find plaintiff suffered ascertainable loss where defendant installed surveillance cameras on his

building that were visible to patrons entering exotic dance clubs owned by plaintiff, and

defendant's actions "caused prospective patrons to refrain from entering the plaintiffs' establishments"); *id.* at 265 (finding that "[a] loss of prospective customers constitutes a 'deprivation, detriment [or] injury' that is "capable of being discovered, observed or established" (citation omitted)). Mr. Drena's loan payment statement is sufficient at this stage—where the Court must construe the facts in his favor—to deny summary judgment on this ground.

Bank of America seems to suggest that because Mr. Drena "rebuffed [Bank of America's] modification efforts . . . because he wanted a better deal," the loss that Mr. Drena suffered, if any, was due to Mr. Drena's conduct. Def.'s Br. at 3. The Court disagrees. In *Larobina*, the plaintiff received a written price quote for the cost of purchasing and installing carpeting in his home. 821 A.2d at 285. Upon completion of the installation, plaintiff was provided with a "revised quote" of a different amount than initially quoted. *Id.* at 286. The court rejected the proposition that plaintiff could have simply taken back his $100 deposit and walked away from the transaction rather than initiate a CUTPA claim. *Id.* at 290. The court reasoned:

> Encouraging a claimant to walk away after a business has subjected him to an unfair or deceptive act is not the aim of CUTPA. On the contrary, CUTPA is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices. To achieve that result, CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts. Encouraging claimants to walk away from unfair or deceptive practices does not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired.

*Id.* (internal quotation marks and citations omitted). This reasoning applies with equal force here. To require that Mr. Drena, who has alleged that Bank of America unfairly changed the terms of his mortgage loan, accept the terms of the loan modification as offered, would "not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired." *Id.*

For these reasons, Bank of America's motion for summary judgment with respect to Mr. Drena's CUTPA claim is denied. *See, e.g.*, *Laura Laaman & Assocs., LLC v. Davis*, No. 16-CV-00594 (MPS), 2017 WL 5711393, at *10 (D. Conn. Nov. 27, 2017) (finding that whether defendant did not violate CUPTA because her action were not deceptive, did not harm plaintiff, and did not disclose proprietary information presented a genuine issue of material fact); *Milso Indus. Corp. v. Nazzaro*, No. 3:08CV1026 AWT, 2012 WL 3778978, at *15 (D. Conn. Aug. 30, 2012) (finding that issues of material fact existed as to whether plaintiff's business plan and customer list were comprised of publically available information and as to whether defendant's conduct constituted unfair competition).

## B.     CONNECTICUT CREDITOR'S COLLECTION PRACTICES ACT (Count Two)

Bank of America contends that Mr. Drena has failed to show that its actions were "abusive, harassing, fraudulent, deceptive or misleading," Def.'s Br. at 8, as required to prove a violation of the Connecticut Creditor's Collection Practices Act.[9] The Court agrees.

The CCPA provides a private right of action against a creditor for damages, Conn. Gen. Stat. § 36a-648, for claims arising under Section 36a-646 of the Connecticut General Statutes.[10] *Weldon v. MTAG Servs., LLC*, No. 3:16-cv-783 (JCH), 2017 WL 776648, at *19 n.19 (D. Conn. Feb. 28, 2017). "The statute identifies not only who may bring an action, but the remedies available to that person." *Dattilio v. HSBC Bank Nevada, N.A.*, No. CV116011573, 2012 WL 695458, at *2 (Conn. Super. Ct. Feb. 1, 2012). It provides:

> A creditor . . . who uses any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice with

---

[9] For purposes of this motion, Bank of America does not dispute that it is a "creditor" within the meaning of the CCPA and that it "collected or attempted to collect a debt" within the meaning of the CCPA.

[10] Section 36a-646 reads: "No creditor shall use any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt."

respect to any person to collect or attempt to collect a debt in violation of section 36a-646 . . . or the regulations adopted pursuant to section 36a-647 or 36a-809 shall be liable to such person [for] damages . . . .

Conn. Gen. Stat. Ann. § 36a-648(a).

Regulations promulgated under the CCPA further provide that "[a] creditor shall not use any fraudulent, deceptive or misleading representation, device or practice in connection with the collection of any debt." Conn. Agencies Reg. § 36a-647-6. "That regulation also provides a list of illustrative examples of fraudulent and misleading conduct, such as falsely representing that the creditor is bonded by a governmental entity, falsely implying that an individual is an attorney, or representing that nonpayment may result in criminal prosecution." *Bank of New York Mellon v. Worth*, No. 3:13-CV-1489 (MPS), 2016 WL 1048742, at *10 (D. Conn. Mar. 14, 2016) (citing Conn. Agencies Regs. §§ 36a-647-6(1)–(17)).

Mr. Drena alleges that "the means used and acts, practices and misrepresentations made to the [Mr. Drena] in connection with [Bank of America]'s attempts to collect their debt were abusive, deceptive and misleading." Compl. ¶ 46, ECF No. 1. As discussed above, *see infra* Section III.B.1, Mr. Drena has created a genuine issue of material fact and a reasonable jury could infer that Bank of America enrolled him in a loan modification program without his knowledge or authority in violation of CUTPA.

There is no evidence in the record, however, to suggest that Bank of America engaged in "fraudulent, deceptive or misleading representation," within the meaning of the CCPA, in the enrollment of Mr. Drena in the loan modification program. Although Mr. Drena maintains he did not agree to the enrollment, there are no records about what happened regarding his enrollment from which a reasonable juror could infer that anyone at Bank of America did or said anything fraudulent, deceptive, or misleading to Mr. Drena. *See, e.g.*, *Arias v. Gutman, Mintz, Baker &*

*Sonnenfeldt LLP*, 875 F.3d 128, 136 (2d Cir. 2017) (discussing the contents of communications in analyzing whether the communications were in violation of the Fair Debt Collection Practices Act, a federal analog to the CCPA); *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 173 (2d Cir. 2015) (same). For example, Mr. Drena has not offered evidence that would support an allegation that Bank of America represented that it was "vouched for, bonded by or affiliated with the United States," Conn. Agencies Regs. § 36a-647-6 (1); that it "threat[ened] to take [] action that cannot legally be taken," *id.* § 36a-647-6(6); or that it used "deceptive means to collect or attempt to collect any debt," *id.* § 36a-647-6(11). Indeed, Mr. Drena's claim, one properly plead under CUTPA, is fundamentally different from the more specific deceptive practices that the CCPA seeks to address.

The issue here is how Bank of America revoked its waiver of escrow payments and whether Bank of America has a practice of inducing customers to accept loan products they may not want, the essence of Mr. Drena's CUTPA claim, not whether Bank of America acted fraudulently "to collect or attempt to collect [the underlying] debt." Conn. Gen. Stat. § 36a-646. Moreover, as discussed in more detail below, *see infra* Part III.C., the record demonstrates Bank of America timely and properly reviewed the Drenas' home mortgage loan for foreclosure prevention options.

There is no genuine issue of disputed fact as to whether Banks of America's conduct violated the CCPA. Bank of America's motion for summary judgment on this count therefore is granted.

### C.   INNOCENT MISREPRESENTATION (Count Three)

Mr. Drena also claims innocent misrepresentation. That claim is premised on the theory that Bank of America misrepresented to him that his "loan would be timely and properly

reviewed for foreclosure prevention options" over a four year period. Compl. ¶ 50. An innocent misrepresentation claim has the following elements: "(1) a representation of material fact (2) made for the purpose of inducing [the plaintiff to act], (3) the representation is untrue, and (4) there is justifiable reliance by the plaintiff on the representation by the defendant and (5) damages." *Frimberger v. Anzellotti*, 594 A.2d 1029, 1034 (Conn. 1991).

After drawing all reasonable inferences in Mr. Drena's favor, he has failed to show that there is a genuine factual dispute concerning whether Bank of America falsely represented that it would timely and properly review the home mortgage loan for foreclosure prevention options. Rather, the record demonstrates Bank of America timely and properly reviewed the home mortgage loan for foreclosure prevention options by (i) reviewing Mr. Drena's HAMP modification requests, (ii) offering the Drenas trial period plans and a permanent loan modification, and (iii) advising the Drenas of alternatives to foreclosure.

First, the record indicates that Bank of America promptly reviewed Mr. Drena's HAMP modification requests beginning with its consideration of Mr. Drena's first HAMP modification request on March 5, 2010. Def.'s Br., Ex. C at 8. Bank of America responded to that request two weeks later in a letter dated March 20, 2010. Def.'s Br., Ex. A-5 at 2. The letter indicated that Bank of America was "missing some required documents" *Id.* Accordingly, Bank of America told the Drenas that it was "unable to finalize [their] Home Affordable Modification [request] until [it] receive[d] . . . additional and/or correct and complete information" by March 30, 2010. *Id.* There is no evidence in the record that Mr. Drena ever responded to that letter.

More than twelve weeks later, on June 27, 2010, Mr. Drena submitted another HAMP modification request, Def.'s Br., Ex. A-6—a request Bank of America considered and denied. Def.'s Br., Ex. A-8 at 2. The Drenas appealed that decision. Def.'s SMF ¶ 34. A mere two

months after its denial, in a letter dated February 10, 2011, Bank of America informed the Drenas that it had considered their appeal and concluded that their home mortgage loan did not meet the eligibility criteria for HAMP. Def.'s Br., Ex. A-9 at 2. The letter stated that the Drenas could reapply. *Id.* Less than a month later, on March 2, 2011, Mr. Drena did. Def.'s Br., Ex. A-10. A month later, in a letter to the Drenas dated April 2, 2011, Bank of America responded to Mr. Drena's request. Def.'s Br., Ex. A-11. In that letter, Bank of America—as it had in its response letter to Mr. Drena's first HAMP modification request—indicated that Bank of America lacked the requisite information to verify the Drenas eligibility for HAMP and directed the Drenas to submit the additional, requested information by May 2, 2011. *Id.* at 2. On May 4, 2011, Bank of America provided the Drenas until May 19, 2011, to submit the required documents because some documents were still missing. Def.'s Br., Ex. A-12. On June 4, 2011, presumably after the Drenas submitted the outstanding documents, Bank of America informed the Drenas that the loan did not qualify for a HAMP modification. Def.'s Br., Ex. A-13 at 2.

Second, after the June 4, 2011 denial, over the next two years, the record shows that Bank of America remained in communication with the Drenas concerning alternatives to foreclosure.[11] Def.'s Br., Ex. A-15 (Nov. 2011); Ex. A-17 (Apr. 2012); Ex. A-19 (June 2012); Ex. A-20 (Mar. 2013); Ex. A-22 at 1 (May 2013), 11 (June 1, 2013), 20 (June 7, 2013), 29 (June 14, 2013), 38 (June 18, 2013); Ex. A-24 (July 2013); Ex. A-25 (Sept. 2013). For example, Bank of America offered the Drenas an opportunity to permanently modify their home mortgage loan in April 2012. Def.'s Br., Ex. A-17. Under that offer, the interest rate on the home mortgage loan would be reduced from 5.5% to 4.625%, monthly installments would decline from $1,476.06 to

---

[11] The record indicates that Mr. Drena submitted four additional loan modification requests. Def.'s Br., Ex. A-14 (Aug. 2011); Ex. A-16 (Nov. 2011); Ex. A-18 (May 2012); Ex. A-21 (June 2013); Ex. A-23 (June 2013), ECF No. 39-25.

$1,251.91, and the proposed offer would capitalize $24,009.53 in delinquent interest and delinquent escrow. Def.'s SMF ¶ 45. The Drenas, however, refused that offer. *Id.* ¶ 46. The record also shows that Bank of America offered the Drenas opportunities to take a part of three trial period plans that would modify their mortgage to lessen their financial burden. Def.'s Br., Ex. A-3; Ex. A-15; Ex. A-19. But, the Drenas did not accept any of those offers. Def.'s L.R. 56(a)(1) Stmt. ¶¶ 17, 43, 49.

Third, the record shows that Bank of America specifically advised the Drenas of several alternative to foreclosure options. Def.'s Br., Ex. A-7; Ex. A-8. In a letter dated November 16, 2010, after advising the Drenas that the mortgage was in "serious default," Bank of America stated it "want[ed] [the Drenas] to be aware of various options that may be available . . . to prevent foreclosure sale of the property." Def.'s Br., Ex. A-7. Bank of America advised the Drenas of four potential alternatives to foreclosure and encouraged the Drenas to contact Bank of America if they were interested in pursuing any of those options. *Id.* at 4. Less than a month later, on December 10, 2010, Bank of America sent another letter to the Drenas about alternatives to foreclosure. Def.'s Br., Ex. A-8. This letter, like the November 2010 letter, provided overviews of the alternatives and encouraged the Drenas to contact Bank of America for more information. *Id.* Moreover, in a June 2011 letter, Bank of America advised the Drenas that it was "currently reviewing [their] financial information to determine if there are other options available to [them]." Def.'s Br., Ex. A-13.

Accordingly, because Mr. Drena has failed to raise a genuine issue of material fact as to whether Bank of America falsely represented that his loan would be timely and properly reviewed for foreclosure prevention options, Bank of America is entitled to summary judgment on this claim. *See Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (A "*pro se*

party's bald assertions unsupported by evidence [] are insufficient to overcome a motion for summary judgment."); *see also Mathis v. Eisner*, No. CIV A 3:03CV771 (CFD), 2008 WL 4298330, at *3 (D. Conn. Sept. 17, 2008) (quoting *Rodriguez*).

### D.     NEGLIGENT MISREPRESENTATION (Count 4)

The elements of a claim for negligent misrepresentation are: "(1) that a misrepresentation of fact was made; (2) that the party making it knew or should have known that it was untrue; (3) that the other party reasonably relied upon it; and (4) that the latter suffered pecuniary harm as a result thereof." *United Rentals, Inc. v. Wagner*, No. 3:07-CV-00519, 2008 WL 2167021, at *3 (D. Conn. May 22, 2008).

As with his innocent misrepresentation claim, Mr. Drena asserts that Bank of America misrepresented that his loan would be timely and properly reviewed for foreclosure prevention options. Compl. ¶ 54. He also claims that Bank of America used improper loan modification criteria and made mathematical errors in assessing his financial status and unreasonably delayed in processing his information. Comp. ¶ 24.

For the reasons discussed above, *see infra* Section III.B., the record does not support Mr. Drena's contention that Bank of America made misrepresentations concerning its review of his loan for alternatives to foreclosure. Moreover, Mr. Drena points to no evidence in the record that Bank of America used improper loan modification criteria or made mathematical errors in assessing Mr. Drena's financial status. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) ("Unsupported allegations do not create a material issue of fact.").

Accordingly, Bank of America's motion for summary judgment on this count is granted.

### E.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (Count Six)

Mr. Drena alleges it was foreseeable that deducting unauthorized payments, ignoring his repeated requests of a loan-modification, failing to process his loan modification applications, and initiating a foreclosure would cause him emotional distress. Compl. ¶¶ 62–66. The Court disagrees.

To prevail on a claim for negligent infliction of emotional distress, a plaintiff must show that: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 126 (Conn. 2003). "In negligent infliction of emotional distress claims, unlike general negligence claims, the foreseeability of the precise 'nature of the harm to be anticipated [is] a prerequisite to recovery even where a breach of duty might otherwise be found.'" *Perodeau v. City of Hartford*, 792 A.2d 752, 767 (Conn. 2002) (quoting *Maloney v. Conroy*, 545 A.2d 1059, 1062 (Conn. 1988)).

As set forth above, *see supra* Section III.B.3, the record does not support Mr. Drena's argument that Bank of America failed to timely review and properly process his loan modification applications, much less that it ignored them in their entirety. Even if Mr. Drena had shown that Bank of America was untimely in processing his loan modification applications, such conduct does not suggest that Bank of America negligently caused Mr. Drena emotional distress. "While [Bank of America] may have conducted a frustrating loan modification process, particularly if it had an unsystematic process for requesting required documents . . . , this conduct standing alone cannot create an unreasonable risk of causing severe illness or bodily harm . . . ."

*Henderson v. Wells Fargo Bank, N.A.*, No. 3:13-cv-378 (JBA), 2017 WL 731780, at *8 (D. Conn. Feb. 21, 2017).

The question then is whether the illness Mr. Drena alleges was a "foreseeable consequence of particularly egregious conduct," namely Bank of America's actions or omissions with regard to enrolling him in a loss mitigation program absent his knowledge or authorization. *Perodeau*, 792 A.2d at 767. Although there is a genuine issue of fact concerning whether Bank of America improperly debited funds from Mr. Drena's account for escrow as a condition of a loss mitigation program for which he had yet to submit an application for consideration, that conduct alone does not suffice to show either that Bank of America created an unreasonable risk of causing Mr. Drena emotional distress or that such emotional distress was foreseeable. *See* Def.'s Br., Ex. C at 9.

There is nothing in the record to suggest that "a *reasonable person* would have suffered emotional distress . . . that . . . might result in illness or bodily harm" because Bank of America withdrew the waiver of escrow on the Drenas' mortgage loan, a condition contemplated by the Drenas' mortgage agreement. *Angiolillo v. Buckmiller*, 927 A.2d 312, 321 (Conn. App. 2007) (citing *Perodeau*, 792 A.2d at 768); *cf. Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 300 (D. Conn. 2017) (finding that "[p]laintiff fail[ed] to assert facts sufficient to establish that [defendant] Bank should have anticipated that closing [p]laintiff's bank accounts would create in their erstwhile depositor an emotional distress so severe that it might result in [p]laintiff suffering illness or bodily harm," although recognizing that plaintiff "felt irritation, coupled with the anxiety and uncertainty" resulting from such closure); *O'Neill v. Riversource Life Ins. Co.*, No. 3:10-cv-898 JCH, 2010 WL 3925988, at *2 (D. Conn. Sept. 29, 2010) (dismissing a claim where

the plaintiff failed to allege that an insurance company, in denying the plaintiff's claim, "was aware of any particular susceptibility on the part of plaintiff to experiencing emotional distress").

The decision in *Henderson v. Wells Fargo Bank, N.A.* is instructive. No. 3:13-cv-378 (JBA), 2017 WL 731780 (D. Conn. Feb. 21, 2017). Fearing she could no longer afford her monthly mortgage payments, the plaintiff contacted the bank to inquire about a loan modification. *Id.* at *1. The bank advised her that it would review her for a HAMP loan modification. *Id.* Plaintiff then defaulted on her loan and the bank initiated foreclosure proceedings. *Id.* Plaintiff brought a claim of negligent infliction of emotional distress against the bank. *Id.* The court found that "no reasonable jury could find that Defendant's conduct [] created an unreasonable risk of causing [p]laintiff emotional distress since it was entitled to prosecute its foreclosure action, even though the foreclosure process itself is undoubtedly distressful for the homeowner." *Id.* at *8. Like in *Henderson*, Bank of America's decision to revoke its wavier may have been distressing to Mr. Drena, but no reasonable jury could find that Bank of America created an unreasonable risk of causing Mr. Drena emotional distress because the mortgage agreement contemplated that Bank of America was entitled revoke the waiver at its option.

Aside from his testimony, Mr. Drena has offered no evidence probative of whether a reasonable person would have reacted as he did. Mr. Drena's conclusory allegations are insufficient to withstand summary judgment. *See Weinstock*, 224 F.3d at 41 ("Unsupported allegations do not create a material issue of fact."). Accordingly, Bank of America is entitled to summary judgment on this count.

## IV.    CONCLUSION

For the reasons set forth above, Bank of America's motion for summary judgment is **GRANTED** in part and **DENIED** in part. The CUTPA claim (count one) remains.

**SO ORDERED** this 27th day of December, 2017, at Bridgeport, Connecticut.

                              /s/ Victor A. Bolden
                              VICTOR A. BOLDEN
                              UNITED STATES DISTRICT JUDGE